AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>5834 NE 75th Street, apt B208, Seattle, WA 98115 and<br>Android phone, model 1+, phone number 206-316-6268 | ) )<br>) )<br>) )<br>) )<br>) )    Case No.   MJ18-568 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-1 and A-2, which is incorporated herein by reference.

located in the _____ Western _____ District of _____ Washington _____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B-1 and B-2, which is incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21, U.S.C. §§ 841(a)(1), 846 | Distribution of Controlled Substances, Possession of Controlled Substances with Intent to Distribute, and Conspiracy to do the same. |

The application is based on these facts:

Please see Affidavit of U.S. Postal Inspector Michael Fischlin

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael Fischlin, U.S. Postal Inspector
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Dec 11, 2018

_____
*Judge's signature*

James P. Donohue, United States Magistrate Judge
*Printed name and title*

City and state:  Seattle, Washington

# AFFIDAVIT OF MICHAEL FISCHLIN

STATE OF WASHINGTON    )
                       )   ss
COUNTY OF KING         )

I, Michael Fischlin, an Inspector with United States Postal Inspection Service ("USPIS"), Seattle, Washington, having been duly sworn, state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Postal Inspector with the USPIS and have been so employed since June 2016.  I am currently assigned to the Seattle Division, Prohibited Mail Narcotics Team, where I investigate controlled substances transported via the United States Mail.  I have attended a one-week training course presented by the USPIS addressing narcotics investigations and trends in narcotics mailings.  At that training, subject matter experts taught current trafficking trends and suspicious parcel recognition.

2.      Prior to becoming a Postal Inspector, I was employed as a Special Agent ("SA") of the United States Secret Service ("USSS").  As part of my training, I completed the Federal Law Enforcement Training Center ("FLETC") Criminal Investigator Training Program as well as the USSS SA Training Program.  While employed by the USSS, I was trained in computer forensics.  Prior to joining the USSS, I served four years of active duty in the United States Marine Corps as a military policeman.

3.      As a Postal Inspector, I am authorized to investigate crimes involving federal offenses relating to the United States Postal Service ("USPS").  During the course of my law enforcement career, I have conducted or participated in criminal investigations involving access device fraud, bank fraud, computer fraud, counterfeit currency and securities, identity theft, illegal narcotics, mail theft, robbery, and wire fraud.  My duties have included planning the execution of search warrants; securing and searching premises; seizing documents, records and other evidence; and interviewing witnesses.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1     4.    As discussed below, MATTHEW WITTERS sold drugs on dark web

2  marketplaces under the handles "kakashisan" and "sayNOtoCUSTOMS," which were

3  shipped via the USPS.  WITTERS completed approximately 2,938 orders on the dark

4  web under the listed monikers for approximately 1,271 bitcoins, valued at approximately

5  $764,588 at the time of sales.

6                    **PURPOSE OF AFFIDAVIT**

7     5.    This affidavit is submitted in support of an application for search warrants

8  for the following property:

9         a.    The residence located at 5834 NE 75th Street, apt B208, Seattle, WA

10  98115, to include the computer described in paragraph 17, all further described in

11  Attachment A-1, which is incorporated herein by reference (hereafter the "SUBJECT

12  RESIDENCE").

13         b.    The cellular phone belonging to MATTHEW WITTERS, *i.e.*,

14  Android phone, model 1+, phone number 206-316-6268, as further described in

15  Attachment A-2 (hereafter the "SUBJECT PHONE").

16     6.    As set forth below, I submit that the property described above contains

17  evidence of drug trafficking, in violation of Title 21, United States Code, Section

18  841(a)(1), including conspiracy to distribute controlled substances, in violation of Title

19  21, United States Code, Section 846.  I seek authority to seize the items described in

20  Attachments B, which are incorporated herein by reference.

21               **SUMMARY OF PROBABLE CAUSE**

22     13.    On December 10, 2018, I obtained a search and seizure warrant in this

23  matter.  A copy of my affidavit is attached as Exhibit C, and is incorporated by

24  reference.[1]

25

26

27  _____

28  [1] Agents executed these warrants on December 10 and 11, 2018, seizing a substantial amount of assets.  WITTERS
was arrested by complaint on December 10 and is currently detained at the Federal Detention Center.

Affidavit of Inspector Fischlin - 2
USAO#2017RO1197

1        14.    On December 10, 2018, MATTHEW WITTERS's girlfriend, who lives

2    with WITTERS at the SUBJECT RESIDENCE, contacted the Seattle Police Department.

3    She said she was worried that WITTERS had not returned to the residence.  She said she

4    feared that he had suffered harm, noting that WITTERS was selling fentanyl to a

5    particular individual named Vince.  She thus appeared unaware that WITTERS had been

6    arrested.

7        15.    On December 11, 2018, HSI contacted WITTERS's girlfriend.  She said

8    that she had looked at the SUBJECT PHONE the day before and saw an old message

9    relating to the sale of fentanyl from WITTERS to a person named "Vince."  She said that

10   she contacted WITTERS's family, and that his mother had retrieved the SUBJECT

11   PHONE.  She advised that the phone was an Android phone, model 1+, phone number

12   206-316-6268.  According to a records check, WITTERS's mother lives in Burien.

13       16.    She said that Vince owed WITTERS between $1800 to $3000 as a drug

14   debt.  She said that there was fentanyl in the SUBJECT RESIDENCE, which she then

15   showed agents.

16       17.    She said that neither she nor WITTERS was employed and that they were

17   both opiate users.  An HSI agent noticed that there was a computer that was open in the

18   living room.  The computer was a Tower, ASUS model, v12xT.  The computer appeared

19   to show a cryptocurrency trading page.  WITTERS's girlfriend said that WITTERS

20   invested in and traded Bitcoin.  I believe that this computer contains evidence of drug

21   trafficking.  As detailed in the prior affidavit, there is probable cause to believe that

22   WITTERS obtained the significant bulk of his wealth, including Bitcoins and other

23   cryptocurrency, from drug trafficking.  There is probable cause to believe that the

24   computer will have evidence of the Bitcoins and cryptocurrency that WITTERS acquired,

25   including the amount, timing, and source.

26

27

28

Affidavit of Inspector Fischlin - 3
USAO#2017RO1197

## TRAINING AND EXPERIENCE REGARDING CELLULAR PHONES

18.     Based upon my training and experience, and conversations with other experienced law enforcement agents and officers who have been involved in narcotics cases, I know the following:

19.     Drug dealers regularly use cell phones, Blackberries, and other electronic communication devices to further their illegal activities.  As a result, evidence of drug dealing can often be found in text messages, address books, call logs, photographs, emails, text messaging or picture messaging applications, videos, and other data that is stored on cell phones, Blackberries, and other electronic communication devices. Additionally, the storage capacity of such devices allows them to be used for the electronic maintenance of ledgers, pay/owe logs, drug weights and amounts, customers contact information, not only during the period of their drug trafficking violations but also for a period of time extending beyond the time during which the trafficker actually possesses/controls illegal controlled substances.  The records are kept in order to maintain contact with criminal associates for future transactions and so that the trafficker can have records of prior transactions for which the trafficker might still be owed money or might owe someone else money.

## SEARCH AND SEIZURE OF DIGITAL MEDIA

20.     As described above and in Attachment B-1, this application seeks permission to search for the items listed in Attachment B-1 that might be found on the SUBJECT RESIDENCE, including the computer that is described in paragraph 17.

21.     In order to examine the digital media seized in a forensically sound manner, law enforcement personnel, with appropriate expertise, will conduct a forensic review of any digital media seized.  The purpose of using specially trained computer forensic examiners to conduct the imaging of any digital media, or digital devices is to ensure the integrity of the evidence and to follow proper, forensically sound, scientific procedures. When the investigative agent is a trained computer forensic examiner, it is not always

Affidavit of Inspector Fischlin - 4
USAO#2017RO1197

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   necessary to separate these duties.  Computer forensic examiners often work closely with
2   investigative personnel to assist investigators in their search for digital evidence.
3   Computer forensic examiners are needed because they generally have technological
4   expertise that investigative agents do not possess.  Computer forensic examiners,
5   however, may lack the factual and investigative expertise that an investigative agent may
6   possess.  Therefore, computer forensic examiners often work closely together.  It is
7   intended that warrant will provide authority for the affiant to forensically review, or seek
8   the assistance of others in HSI or within other law enforcement agencies to assist in the
9   forensic review of any digital

10       22.     I also know the following:
11           a.     Based on my knowledge, training, and experience, your affiant
12   knows that computer files or remnants of such files can be recovered months or even
13   years after they have been downloaded onto a storage medium, deleted, or viewed via the
14   Internet.  Electronic files downloaded to a storage medium can be stored for years at little
15   or no cost.  Even when files have been deleted, they can be recovered months or years
16   later using forensic tools.  This is so because when a person "deletes" a file on a
17   computer, the data contained in the file does not actually disappear; rather, that data
18   remains on the storage medium until it is overwritten by new data.

19           b.     Therefore, deleted files, or remnants of deleted files, may reside in
20   free space or slack space—that is, in space on the storage medium that is not currently
21   being used by an active file—for long periods of time before they are overwritten.  In
22   addition, a computer's operating system may also keep a record of deleted data in a
23   "swap" or "recovery" file.

24           c.     Wholly apart from user-generated files, computer storage media—in
25   particular, computers' internal hard drives—contain electronic evidence of how a
26   computer has been used, what it has been used for, and who has used it.  To give a few
27   examples, this forensic evidence can take the form of operating system configurations,
28   artifacts from operating system or application operation, file system data structures, and

Affidavit of Inspector Fischlin - 5
USAO#2017RO1197

1    virtual memory "swap" or paging files.  Computer users typically do not erase or delete
2    this evidence, because special software is typically required for that task.  However, it is
3    technically possible to delete this information.

4           d.      Similarly, files that have been viewed via the Internet are sometimes
5    automatically downloaded into a temporary Internet directory or "cache."

6           e.      Digital storage devices may also be large in capacity, but small in
7    physical size. Because those who are in possession of such devices also tend to keep them
8    on their persons, especially when they may contain evidence of a crime. Digital storage
9    devices may be smaller than a postage stamp in size, and thus they may easily be hidden
10   in a person's pocket.

11          23.     As further described in Attachment B-1, this application seeks permission
12   to locate not only computer files that might serve as direct evidence of the crimes
13   described on the warrant, but also for forensic electronic evidence that establishes how
14   computers were used, the purpose of their use, who used them, and when. There is
15   probable cause to believe that this forensic electronic evidence will be on the device
16   described in Attachment B-1 because:

17          a.      Data on the digital storage medium or digital devices can provide
18   evidence of a file that was once on the digital storage medium or digital devices but has
19   since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has
20   been deleted from a word processing file). Virtual memory paging systems can leave
21   traces of information on the storage medium that show what tasks and processes were
22   recently active.  Web browsers, email programs, and chat programs store configuration
23   information on the storage medium that can reveal information such as online nicknames
24   and passwords.  Operating systems can record additional information, such as the
25   attachment of peripherals, the attachment of USB flash storage devices or other external
26   storage media, and the times the computer was in use. Computer file systems can record
27   information about the dates files were created and the sequence in which they were
28   created, although this information can later be falsified.

Affidavit of Inspector Fischlin - 6
USAO#2017RO1197

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may

Affidavit of Inspector Fischlin - 7
USAO#2017RO1197

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  either inculpate or exculpate the computer user.  Last, information stored within a

2  computer may provide relevant insight into the computer user's state of mind as it relates

3  to the offense under investigation.  For example, information within the computer may

4  indicate the owner's motive and intent to commit a crime (e.g., internet searches

5  indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program

6  to destroy evidence on the computer or password protecting/encrypting such evidence in

7  an effort to conceal it from law enforcement).

8        c.     A person with appropriate familiarity with how a computer works

9  can, after examining this forensic evidence in its proper context, draw conclusions about

10  how computers were used, the purpose of their use, who used them, and when.

11        d.     The process of identifying the exact files, blocks, registry entries,

12  logs, or other forms of forensic evidence on a storage medium that are necessary to draw

13  an accurate conclusion is a dynamic process.  While it is possible to specify in advance

14  the records to be sought, computer evidence is not always data that can be merely

15  reviewed by a review team and passed along to investigators.  Whether data stored on a

16  computer is evidence may depend on other information stored on the computer and the

17  application of knowledge about how a computer behaves.  Therefore, contextual

18  information necessary to understand other evidence also falls within the scope of the

19  warrant.

20        e.     Further, in finding evidence of how a computer was used, the

21  purpose of its use, who used it, and when, sometimes it is necessary to establish that a

22  particular thing is not present on a storage medium.  For example, the presence or

23  absence of counter-forensic programs or anti-virus programs (and associated data) may

24  be relevant to establishing the user's intent.

25      24.     In most cases, a thorough search of a premises for information that might

26  be stored on digital storage media or other digital devices often requires the seizure of the

27  digital devices and digital storage media for later off-site review consistent with the

28  warrant. In lieu of removing storage media from the premises, it is sometimes possible to

Affidavit of Inspector Fischlin - 8
USAO#2017RO1197

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    make an image copy of storage media.  Generally speaking, imaging is the taking of a

2    complete electronic picture of the digital media's data, including all hidden sectors and

3    deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and

4    completeness of data recorded on the storage media, and to prevent the loss of the data

5    either from accidental or intentional destruction.  This is true because of the following:

6            a.   *The time required for an examination.* As noted above, not all

7    evidence takes the form of documents and files that can be easily viewed on site.

8    Analyzing evidence of how a computer has been used, what it has been used for, and who

9    has used it requires considerable time, and taking that much time on premises could be

10   unreasonable. As explained above, because the warrant calls for forensic electronic

11   evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage

12   media to obtain evidence.  Storage media can store a large volume of information.

13   Reviewing that information for things described in the warrant can take weeks or months,

14   depending on the volume of data stored, and would be impractical and invasive to

15   attempt on-site.

16           b.   *Technical requirements.*  Computers can be configured in several

17   different ways, featuring a variety of different operating systems, application software,

18   and configurations.  Therefore, searching them sometimes requires tools or knowledge

19   that might not be present on the search site.  The vast array of computer hardware and

20   software available makes it difficult to know before a search what tools or knowledge

21   will be required to analyze the system and its data on the Premises.  However, taking the

22   storage media off-site and reviewing it in a controlled environment will allow its

23   examination with the proper tools and knowledge.

24           c.   Variety of forms of electronic media.  Records sought under this

25   warrant could be stored in a variety of storage media formats that may require off-site

26   reviewing with specialized forensic tools.

27       25.   Searching computer systems is a highly technical process that requires

28   specific expertise and specialized equipment.  There are so many types of computer

Affidavit of Inspector Fischlin - 9
USAO#2017RO1197

1  hardware and software in use today that it is rarely possible to bring to the search site all
2  the necessary technical manuals and specialized equipment necessary to consult with
3  computer personnel who have specific expertise in the type of computer, operating
4  system, or software application being searched.

5       26.     The analysis of computer systems and storage media often relies on
6  rigorous procedures designed to maintain the integrity of the evidence and to recover
7  "hidden," mislabeled, deceptively named, erased, compressed, encrypted or password-
8  protected data, while reducing the likelihood of inadvertent or intentional loss or
9  modification of data.  A controlled environment such as a laboratory, is typically required
10 to conduct such an analysis properly.

11      27.     The volume of data stored on many computer systems and storage devices
12 will typically be so large that it will be highly impractical to search for data during the
13 execution of the physical search of the premises.  The hard drives commonly included in
14 desktop computers are capable of storing millions of pages of text.

15      28.     Search of the computer for the evidence described in Attachment B-1 may
16 require a range of data analysis techniques. In some cases, agents may recover evidence
17 with carefully targeted searches to locate evidence without requirement of a manual
18 search through unrelated materials that may be commingled with criminal evidence.
19 Agents may be able to execute a "keyword" search that searches through the files stored
20 in a digital device for special terms that appear only in the materials covered by the
21 warrant. Or, agents may be able to locate the materials covered by looking for a particular
22 directory of file name.  However, in other cases, such techniques may not yield the
23 evidence described in the warrant. Individuals may mislabel or hide files and directories;
24 encode communications to avoid using key words; attempt to delete files to evade
25 detection; or take other steps designed to hide information from law enforcement
26 searches for information.

27      29.     The search procedure of any digital media seized may include the following
28 on-site techniques to seize the evidence authorized by Attachment B-1:

Affidavit of Inspector Fischlin - 10
USAO#2017RO1197

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1          a.     On-site triage of computer systems to determine what, if any,

2 peripheral devices or digital storage units have been connected to such computer systems,

3 a preliminary scan of image files contained on such systems and digital storage devices to

4 help identify any other relevant evidence or potential victims or co-conspirators.

5          b.     On-site copying and analysis of volatile memory, which is usually

6 lost if a computer is powered down, and may contain information about how the

7 computer is being used, by whom, when and may contain information about encryption,

8 virtual machines, or stenography which will be lost if the computer is powered down.

9          c.     On-site forensic imaging of any computers may be necessary for

10 computers or devices that may be partially or fully encrypted in order to preserve

11 unencrypted data that may, if not immediately imaged on-scene become encrypted and

12 accordingly become unavailable for any examination.

13                    **CONCLUSION**

14     30.    Based upon the evidence gathered in this investigation and set out above, I

15 submit that there is probable cause to believe that the locations describe in Attachments A

16 contain evidence of drug trafficking, and I seek permission to seize the items described in

17 Attachments B.

18

19                                   MICHAEL FISCHLIN, Affiant

20                                   Inspector, USPIS

21

22

23     SUBSCRIBED AND SWORN before me on this ___ day of December, 2018.

24

25

26                              The Honorable James P. Donohue

27                              United States Magistrate Judge

28

Affidavit of Inspector Fischlin - 11
USAO#2017RO1197

## **ATTACHMENT A-1**
Place To Be Searched

The place to be searched is 5834 NE 75th Street, apt B208, Seattle, WA 98115.

## **ATTACHMENT A-2**
Place To Be Searched

The property to be searched is an Android phone, model 1+, phone number 206-316-6268, believed to belong to MATTHEW WITTERS.

### Attachment B-1

This warrant authorizes the government to search for the following items that are evidence and/or fruits of possession of controlled substances with intent to distribute and/or distribution of controlled substances:

1. Any controlled substances, in particular fentanyl

2. Drug Paraphernalia: Items to be used to store and distribute controlled substances, such as plastic bags, cutting agents, scales, measuring and packaging equipment and similar items.

3. Drug Transaction Records: Documents such a ledgers, receipts, notes, books and similar items relating to the acquisition, and distribution of controlled substances, however stored, including in digital devices.

4. Customer Supplier Information: Items identifying drug customers and drug suppliers, such as address and/or telephone books, correspondence, diaries, calendars, notes with phone numbers and names, "pay/owe sheets" with drug amounts and prices, papers reflecting names, addresses, and/or telephone numbers of co-conspirators.

5. Documents reflecting the source, receipt, transfer, ownership and disposition of the United States Currency or other monetary instruments, of real estate and personal property, such as vehicle registration, insurance documents, account bank statements, registers, deposit tickets, concealed checks, loan paperwork, wire transfer receipts, debit and credit tickets, and correspondence.

6. All bank and financial records, including bank statements, wire transfers slips/orders, money order receipts, ATM receipts, cashier checks, cashier check receipts, and safe deposit records for the years 2014 through the present.

7. Rental Agreements, correspondence, keys and entry records for the safe deposit boxes and storage units.

8. Correspondence, papers, records, and any other items showing employment or lack thereof.

9. Records of domestic of domestic and foreign travel such as itineraries, passports, tickets, lodging receipts, and payment records.

10. Records an item identifying smart phones, telephones and pagers used by conspirators including telephone toll bills, pager bills, subscriber agreements, cellular telephones/smart phones and pagers.

11. All firearms and ammunition.

12. Items tending to establish the identity of persons in control of the premises or vehicle being searched.

13. For the Tower, ASUS model, v12xT,

   a. evidence of who used, owned, or controlled the digital device or other electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the digital device or other electronic storage media, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

   d. evidence of the attachment to the digital device of other storage devices or similar containers for electronic evidence;

   e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

   f. evidence of the times the digital device or other electronic storage media was used;

   g. passwords, encryption keys, and other access devices that may be necessary to access the digital device or other electronic storage media;

   h. documentation and manuals that may be necessary to access the digital device or other electronic storage media or to conduct a forensic examination of the digital device or other electronic storage media;

Attachment B-1
USAO 2017RO1197

    i.   contextual information necessary to understand the evidence described in this attachment.

    j.   all documents reflecting cryptocurrencies, including web history, and documents showing the location, source, and timing of acquisition, of any cryptocurrencies

THE SEIZURE OF THE COMPUTER DESCRIBED ABOVE IS AUTHORIZED FOR THE PURPOSE OF THE CONDUCTING OFF-SITE EXAMINATION OF ITS CONTENTS FOR EVIDENCE, INSTRUMENTALITIES, OR FRUITS OF THE AFOREMENTIONED CRIMES

**ATTACHMENT B-2**
Items to be Seized

This warrant authorizes the government to search for the following items that are evidence and/or fruits of possession of controlled substances with intent to distribute and/or distribution of controlled substances:

a.      Assigned number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);

b.      Stored list of recent received, sent, and missed calls;

c.      Stored contact information;

d.      Stored photographs of narcotics, currency, firearms or other weapons, evidence of suspected criminal activity, and/or the user of the phone or suspected co-conspirators, including any embedded GPS data associated with those photographs;

e.      Stored text messages.

f.      digital currency applications and wallets, to include information regarding current balance and transaction history, *i.e.*, date, time, amount, and address of the sender/recipient of a digital currency transaction maintained in such wallets;

# Attachment C

## AFFIDAVIT OF MICHAEL FISCHLIN

STATE OF WASHINGTON )
                     )  ss
COUNTY OF KING )

I, Michael Fischlin, an Inspector with United States Postal Inspection Service ("USPIS"), Seattle, Washington, having been duly sworn, state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Postal Inspector with the USPIS and have been so employed since June 2016. I am currently assigned to the Seattle Division, Prohibited Mail Narcotics Team, where I investigate controlled substances transported via the United States Mail. I have attended a one-week training course presented by the USPIS addressing narcotics investigations and trends in narcotics mailings. At that training, subject matter experts taught current trafficking trends and suspicious parcel recognition.

2.      Prior to becoming a Postal Inspector, I was employed as a Special Agent ("SA") of the United States Secret Service ("USSS"). As part of my training, I completed the Federal Law Enforcement Training Center ("FLETC") Criminal Investigator Training Program as well as the USSS SA Training Program. While employed by the USSS, I was trained in computer forensics. Prior to joining the USSS, I served four years of active duty in the United States Marine Corps as a military policeman.

3.      As a Postal Inspector, I am authorized to investigate crimes involving federal offenses relating to the United States Postal Service ("USPS"). During the course of my law enforcement career, I have conducted or participated in criminal investigations involving access device fraud, bank fraud, computer fraud, counterfeit currency and securities, identity theft, illegal narcotics, mail theft, robbery, and wire fraud. My duties have included planning the execution of search warrants; securing and searching premises; seizing documents, records and other evidence; and interviewing witnesses.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

4.    As discussed below, MATTHEW WITTERS sold drugs on dark web marketplaces under the handles "kakashisan" and "sayNOtoCUSTOMS," which were shipped via the USPS. WITTERS completed approximately 2,938 orders on the dark web under the listed monikers for approximately 1,271 bitcoins, valued at approximately $764,588 at the time of sales.

## PURPOSE OF AFFIDAVIT

5.    This affidavit is submitted in support of an application for a search and seizure warrant for the following property:

    a. A safe deposit box held at GBC International Bank located at 16001 Aurora Ave N, Shoreline, WA 98133 (hereinafter described as "SAFE DEPOSIT BOX") linked to checking account number XXXXX1014, as further described in Attachment A, which is incorporated herein by reference.

6.    As set forth below, there is evidence that the SAFE DEPOSIT BOX contains evidence of drug trafficking, in violation of Title 21, United States Code, Section 841(a)(1), including conspiracy to distribute controlled substances, in violation of Title 21, United States Code, Section 846. I seek authority to seize the items described in Attachment B, which is incorporated herein by reference.

7.    I also submit this affidavit in support of an application for combined criminal and civil forfeiture seizure warrants for the following assets (collectively, the "SUBJECT ASSETS"), as more fully set forth in Attachment C, which is incorporated herein by reference:

    a. Up to $86,666.82 in U.S. funds contained in U.S. Bank account number X-XXX-XXXX-1982 held in the name of MATTHEW M. WITTERS ("WITTERS's Checking Account");

    b. Up to $329,250.15 in U.S. funds contained in U.S. Bank account number X-XXX-XXXX-7643 held in the name of MATTHEW M. WITTERS ("WITTERS's Savings Account");

     c.  Up to $3,180 in U.S. funds contained in GBC International Bank account number XXXXX1014 held in the name of MATTHEW M. WITTERS ("WITTERS's GBC Savings Account");

     d.  All funds, including cryptocurrencies, contained in any Gemini Trust Company accounts held in the name of MATTHEW WITTERS with Social Security Number XXX-XX-8436 ("WITTERS's Gemini Account");

     e.  All funds, including cryptocurrencies, contained in any Bittrex accounts held in the name of MATTHEW WITTERS with date of birth XX/XX/1979 ("WITTERS's Bittrex Account"); and

     f.  All U.S. dollar funds contained in Robinhood Markets, Inc. account number XXXX8546 held in the name of MATTHEW WITTERS ("WITTERS's Robinhood Account").

8.    As set forth below, I submit that there is probable cause to believe that the SUBJECT ASSETS are property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 (conspiracy to distribute controlled substances), and/or are property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violations. The SUBJECT ASSETS are therefore subject to forfeiture to the United States under 21 U.S.C. § 853(a).

9.    I further submit that there is probable cause to believe that the SUBJECT ASSETS constitute (1) moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished in exchange for a controlled substance, in violation of the Controlled Substances Act ("CSA"); (2) proceeds traceable to such an exchange; or (3) moneys, negotiable instruments, or securities used or intended to be used to facilitate a violation of the CSA. The SUBJECT ASSETS are therefore subject to forfeiture to the United States under 21 U.S.C. § 881(a)(6).

Affidavit of Inspector Fischlin - 3
USAO#2017RO1197

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   10. Because this affidavit is submitted for the limited purpose of obtaining

2 search and seizure warrants, I am not including every fact known to me about WITTERS

3 or the larger investigation.

4       **FORFEITURE AND SEIZURE AUTHORITY**

5   11. As to civil forfeiture, under 21 U.S.C. § 881(a)(6), "[t]he following shall be

6 subject to forfeiture to the United States and no property right shall exist in them: . . . All

7 moneys, negotiable instruments, securities, or other things of value furnished or intended

8 to be furnished by any person in exchange for a controlled substance or listed chemical in

9 violation of this subchapter, all proceeds traceable to such an exchange, and all moneys,

10 negotiable instruments, and securities used or intended to be used to facilitate any

11 violation of this subchapter."

12   12. Property subject to civil forfeiture under 21 U.S.C. § 881(a) may be seized

13 pursuant to 18 U.S.C. § 981(b) (by 21 U.S.C. § 881(b)).

14   13. As to criminal forfeiture, under 21 U.S.C. § 853(a), "[a]ny person convicted

15 of a violation of this subchapter or subchapter II of this chapter punishable by

16 imprisonment for more than one year shall forfeit to the United States, irrespective of any

17 provision of State law [*inter alia*]—(1) any property constituting, or derived from, any

18 proceeds the person obtained, directly or indirectly, as the result of such violation; [and]

19 (2) any of the person's property used, or intended to be used, in any manner or part, to

20 commit, or to facilitate the commission of, such violation."

21   14. Property subject to criminal forfeiture under 21 U.S.C. § 853 may be seized

22 pursuant to 21 U.S.C. § 853(f). With respect to seizure, 21 U.S.C. § 853(f) specifically

23 provides that a court may issue a criminal seizure warrant when it "determines that there

24 is probable cause to believe that the property to be seized would, in the event of

25 conviction, be subject to forfeiture and that a[] [protective] order under [21 U.S.C.

26 § 853(e)] may not be sufficient to assure the availability of the property for forfeiture."

27   15. Here, because the SUBJECT ASSETS may be easily withdrawn,

28 transferred, dissipated, or otherwise made unavailable for forfeiture, a protective order

Affidavit of Inspector Fischlin - 4
USAO#2017RO1197

1   may not be sufficient to ensure that the SUBJECT ASSETS remain available for

2   forfeiture. For that reason, the United States seeks combined criminal and civil seizure

3   warrants, authorizing law enforcement to seize the SUBJECT ASSETS and preserve

4   them pending further forfeiture proceedings.

5         **BACKGROUND ON THE DARK WEB AND CRYPTOCURRENCY**

6        16.     Based on my training, research, education, and experience, I am familiar

7   with the following relevant terms and definitions:

8        a.     The "dark web" is a portion of the "Deep Web"[1] of the Internet,

9   where individuals must use anonymizing software or applications to access content and

10   websites. Within the dark web, criminal marketplaces operate, allowing individuals to

11   buy and sell illegal items, such as drugs, firearms, and other hazardous materials, with

12   greater anonymity than is possible on the traditional Internet (sometimes called the "clear

13   web" or simply the "web"). These online market websites use a variety of technologies,

14   including the Tor network (defined below) and other encryption technologies, to ensure

15   that communications and transactions are shielded from interception and monitoring.

16   Famous dark web marketplaces, also called Hidden Services, such as Silk Road,

17   AlphaBay,[2] and Dream Market,[3] operate(d) similarly to clear web commercial websites

18   such as Amazon and eBay, but offered illicit goods and services.

19        b.     "Vendors" are the dark web's sellers of goods and services, often of

20   an illicit nature, and they do so through the creation and operation of "vendor accounts"

21   on dark web marketplaces. Customers, meanwhile, operate "customer accounts." Vendor

22   and customer accounts are not identified by numbers, but rather monikers or "handles,"

23

24

---

25   [1] The Deep Web is the portion of the Internet not indexed by search engines. Examples are databases and
internal networks belonging to private industry, government agencies, or academic institutions.

26   [2] Based upon my training and experience, I know that AlphaBay was a website on the dark web that
offered drugs and other contraband for sale. Furthermore, I know that AlphaBay was seized by U.S. law

27   enforcement in July 2017.

28   [3] Based upon my training and experience, I know that Dream Market is a website on the dark web that
offers drugs and other contraband for sale.

Affidavit of Inspector Fischlin - 5
USAO#2017RO1197

1  much like the username one would use on a clear web site.  If a moniker on a particular
2  marketplace has not already been registered by another user, vendors and customers can
3  use the same moniker across multiple marketplaces, and based on seller and customer
4  reviews, can become well known as "trusted" vendors or customers.  It is also possible
5  for the same person to operate multiple customer accounts and multiple vendor accounts
6  at the same time.  For example, based on my training and experience, I know that one
7  person could have a vendor account that he or she uses to sell illegal goods on a dark web
8  marketplace in exchange for cryptocurrency; that same vendor could also have a different
9  customer account that he or she uses to exchange cryptocurrency earned from vendor
10 sales for fiat currency.[4]  Because they are separate accounts, a person could use different
11 accounts to send and receive the same cryptocurrency on the dark web.  I know from
12 training and experience that one of the reasons dark web vendors have multiple monikers
13 for different vendor and customer accounts is to prevent law enforcement from
14 identifying which accounts belong to the same person and who the actual person is that
15 owns or uses the accounts.

16        c.    Pretty Good Privacy ("PGP") is used on dark web markets to encrypt
17 communications between vendors and customers.   When a customer orders from a
18 vendor or sends a vendor a message on a dark web market, that information may be
19 stored in the marketplace's database.  Given concerns that the marketplace server may be
20 hacked or seized by law enforcement, vendors and customers often communicate via
21 PGP-encrypted means to address this security problem.

22        d.    The "Tor network," or simply "Tor," (an abbreviation for "The
23 Onion Router") is a special network of computers on the Internet, distributed around the
24 world, designed to conceal the true Internet Protocol ("IP") addresses of the computers
25 accessing the network, and, thereby, the locations and identities of the network's users.

26

27 [4] Fiat currency is currency created and regulated by a government such as the U.S. Dollar, Euro, or
28 Japanese Yen.

Affidavit of Inspector Fischlin - 6
USAO#2017RO1197

1   Tor also enables websites to operate on the network in a way that conceals the true IP
2   addresses of the computer servers hosting the websites, which are referred to as "hidden
3   services" on the Tor network.  Such hidden services operating on Tor have complex web
4   addresses, generated by a computer algorithm, ending in ".onion" and can only be
5   accessed through specific web browser software, including a browser known as "Tor
6   Browser," designed to access the Tor network.  An example of a hidden services website
7   is the aforementioned AlphaBay.
8            e.      Cryptocurrency, a type of virtual currency, is a decentralized, peer-to-
9   peer, network-based medium of value or exchange that may be used as a substitute for
10  fiat currency to buy goods or services or exchanged for fiat currency or other
11  cryptocurrencies.  Examples of cryptocurrency are Bitcoin[5] ("BTC"), Ethereum ("ETH"
12  or "ether"), and Tether ("USDT").  Cryptocurrency can exist digitally on the Internet, in
13  an electronic storage device, or in cloud-based servers.  Although not usually stored in
14  any physical form, public and private keys (described below) used to transfer
15  cryptocurrency from one person or place to another can be printed or written on a piece
16  of paper or other tangible object.  Cryptocurrency can be exchanged directly person to
17  person, through a cryptocurrency exchange, or through other intermediaries.  Generally,
18  cryptocurrency is not issued by any government, bank, or company; it is instead
19  generated and controlled through computer software operating on a decentralized peer-to-
20  peer network.  Most cryptocurrencies have a "blockchain," which is a distributed public
21  ledger, run by the decentralized network, containing an immutable and historical record
22  of every transaction.[6]   Cryptocurrency is not illegal in the United States.
23
24
25
26  [5] Since Bitcoin is both a cryptocurrency and a protocol, capitalization differs.  Accepted practice is to use
    "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and
27  "bitcoin" (with a lowercase letter b) or "BTC" to label units of the cryptocurrency.  That practice is
    adopted here.
28  [6] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate
    transactions, making it difficult to trace or attribute transactions.

Affidavit of Inspector Fischlin - 7                          UNITED STATES ATTORNEY
USAO#2017RO1197                                              700 STEWART STREET, SUITE 5220
                                                            SEATTLE, WASHINGTON 98101
                                                                  (206) 553-7970

1          f.          Bitcoin is a type of cryptocurrency.  Payments or transfers of value

2    made with bitcoin are recorded in the Bitcoin blockchain and thus are not maintained by

3    any single administrator or entity.  As mentioned above, individuals can acquire bitcoin

4    through exchanges (i.e., online companies which allow individuals to purchase or sell

5    cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), bitcoin

6    ATMs, or directly from other people.  Individuals can also acquire cryptocurrencies by

7    "mining."  An individual can "mine" bitcoins by using his/her computing power to solve

8    a complicated algorithm and verify and record payments on the blockchain.  Individuals

9    are rewarded for this task by receiving newly created units of a cryptocurrency.

10   Individuals can send and receive cryptocurrencies online using many types of electronic

11   devices, including laptop computers and smart phones.  Even though the public addresses

12   of those engaging in cryptocurrency transactions are recorded on a blockchain, the

13   identities of the individuals or entities behind the public addresses are not recorded on

14   these public ledgers.  If, however, an individual or entity is linked to a public address, it

15   may be possible to determine what transactions were conducted by that individual or

16   entity.  Bitcoin transactions are therefore sometimes described as "pseudonymous,"

17   meaning that they are partially anonymous.  And while it is not completely anonymous,

18   Bitcoin allows users to transfer funds more anonymously than would be possible through

19   traditional banking and credit systems.

20          g.          Cryptocurrency is stored in a virtual account called a wallet.  Wallets

21   are software programs that interface with blockchains and generate and/or store public

22   and private keys used to send and receive cryptocurrency.  A public key (or public

23   address) is akin to a bank account number, and a private key (or private address) is akin

24   to a Personal Identification Number ("PIN") number or password that allows a user the

25   ability to access and transfer value associated with the public address or key.  To conduct

26   transactions on a blockchain, an individual must use the public key and the private key.

27   A public address is represented as a case-sensitive string of letters and numbers.  Each

28   public address is controlled and/or accessed through the use of a unique corresponding

Affidavit of Inspector Fischlin - 8
USAO#2017R01197

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   private key—the cryptographic equivalent of a password or PIN—needed to access the

2   address.  Only the holder of an address's private key can authorize any transfers of

3   cryptocurrency from that address to another cryptocurrency address.

4           h.      Although cryptocurrencies such as Bitcoin have legitimate uses,

5   cryptocurrency is also used by individuals and organizations for criminal purposes such

6   as money laundering, and is an oft-used means of payment for illegal goods and services

7   on hidden services websites operating on the Tor network.  By maintaining multiple

8   wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law

9   enforcement's efforts to track purchases within the dark web marketplaces.  As of

10  December 3, 2018, one bitcoin is worth approximately $3,818.15, though the value of

11  bitcoin is generally much more volatile than that of fiat currencies.

12          i.      Exchangers and users of cryptocurrencies store and transact their

13  cryptocurrency in a number of ways, as wallet software can be housed in a variety of

14  forms, including: on a tangible, external device ("hardware wallet"); downloaded on a

15  Personal Computer ("PC") or laptop ("desktop wallet"); with an Internet-based cloud

16  storage provider ("online wallet"); as a mobile application on a smartphone or tablet

17  ("mobile wallet"); as printed public and private keys ("paper wallet"); and as an online

18  account associated with a cryptocurrency exchange.  Because these desktop, mobile, and

19  online wallets are electronic in nature, they are located on mobile devices (e.g., smart

20  phones or tablets) or at websites that users can access via a computer, smart phone, or any

21  device that can search the Internet.  Moreover, hardware wallets are located on some type

22  of external or removable media device, such as a Universal Serial Bus ("USB") thumb

23  drive or other commercially available device designed to store cryptocurrency (e.g.

24  Trezor, Keepkey, or Nano Ledger).  In addition, paper wallets may contain an address

25  and a QR code[7] with the public and private key embedded in the code.  Paper wallet keys

26  are not stored digitally.  Wallets can also be backed up into, for example, paper printouts,

27

28  [7] A QR code is a matrix barcode that is a machine-readable optical label.

Affidavit of Inspector Fischlin - 9
USAO#2017RO1197

1  USB drives, or CDs, and accessed through a "recovery seed" (random words strung

2  together in a phrase) or a complex password.  Additional security safeguards for

3  cryptocurrency wallets can include two-factor authorization (such as a password and a

4  phrase).  I also know that individuals possessing cryptocurrencies often have safeguards

5  in place to ensure that their cryptocurrencies become further secured in the event that

6  their assets become potentially vulnerable to seizure and/or unauthorized transfer.

7         j.     Cryptocurrency mixing services exist which allow for a user to make

8  their transactions and digital assets anonymous on the blockchain.  Cryptocurrency

9  mixing services work by sending a user's coins to a pool where they are then mixed with

10  coins belonging to others.  A user then receives coins from wallets that are unrelated to

11  their own, thereby obfuscating the link between a user's old and new wallets.  These

12  services are often referred to as a "mixers" or "tumblers."[8]

13         k.     Bittrex, Coinbase, and Gemini Trust Company ("Gemini") are

14  companies that each offer a cryptocurrency wallet service.  Users of Bittrex, Coinbase,

15  and Gemini can create online accounts with the respective companies where they can

16  purchase, sell, exchange, store, receive, and/or transfer cryptocurrencies.

17         l.     According to its website, Gemini is a digital asset exchange that

18  allows users to buy, sell, and store digital assets such as bitcoins.  According to its

19  website, Bittrex is a blockchain platform that provides users with digital wallets and the

20  ability to execute trades.

21         m.    In light of the above information regarding Bittrex and Gemini, I

22  anticipate that both companies, if served with a seizure warrant, would be capable of

23  assisting with the seizure of cryptocurrencies that are stored in, or accessible via, Bittrex

24  and Gemini-provided wallets.

25

26

27

28

---

[8] Based upon my training and experience, I know that dark web vendors often utilize mixers allowing them to transact anonymously on the blockchain.

Affidavit of Inspector Fischlin - 10
USAO#2017RO1197

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1          **SUMMARY OF PROBABLE CAUSE**

2    A.    **The Seized Packages**

3          17.    During the investigation, law enforcement seized multiple packages of

4    drugs that were destined for WITTERS.

5          18.    Specifically, on or about November 20, 2017, I intercepted an international

6    parcel at the Shoreline Post office.  The parcel was from China and addressed to

7    WITTERS at 16738 2nd Ave NE, Shoreline, WA.  A Homeland Security Investigations

8    ("HSI") SA conducted an extended border search of the parcel.  The parcel contained

9    small plastic baggies with a white powder and a rock-like substance.  The substances

10   found within the parcel were sent to the Washington State Patrol ("WSP") Crime

11   Laboratory for analysis.  On November 27, 2018, the WSP Crime Laboratory provided

12   results.  Based upon gas chromatography/mass spectrometry and infrared spectroscopy, a

13   WSP Crime Laboratory forensic scientist concluded that one of the baggies containing

14   five grams of white powder contained fentanyl.  USPS business records showed that a

15   phone number associated with WITTERS had tracked the parcel.

16         19.    On or about November 20, 2017, U.S. Customs and Border Protection

17   ("CBP") in San Francisco, California, had seized an international parcel from China

18   addressed to WITTERS at the same Shoreline address.  The package contained a variety

19   of substances, including approximately five grams of a substance that was presumptively

20   identified as fentanyl hydrochloride.  Fentanyl hydrochloride is the hydrochloride salt

21   form of fentanyl.

22         20.    Previously, on or about September 9, 2017, CBP in Torrance, California,

23   had seized an international parcel from Tonga addressed to WITTERS at the same

24   Shoreline address.  The package contained a variety of substances, including

25   approximately six grams of a substance that was presumptively identified as

26   benzylfentanyl.  Benzylfentanyl is a fentanyl analog.

27

28

Affidavit of Inspector Fischlin - 11
USAO#2017RO1197

1  **B.     WITTERS's Orders on the Dark Web**

2        21.     In April 2017, federal agents executed a search warrant for a residence in

3  Oklahoma. The residence was associated with a dark web vendor who operated on

4  AlphaBay who shipped controlled substances, including fentanyl, via the USPS. Agents

5  seized drugs from the residence, including fentanyl. In addition, a spiral notebook was

6  found inside of a backpack within the residence. One of the pages within the notebook

7  contained a label bearing the name "Matt Witters" and the address "2104 SW 110th St,

8  Seattle, WA 98146." On the same page, the word "saynotocustoms" was handwritten.

9  Using a law enforcement database, I found that WITTERS was associated with this street

10  address.

11        22.     In December 2017, I learned of a USPIS case in California that involved a

12  suspect in Seattle. Specifically, in August 2017, S.G. was charged in the Southern

13  District of California with Conspiracy to Distribute Fentanyl, Possession with Intent to

14  Distribute Carfentanil, and Possession with Intent to Distribute Ketamine. Pursuant to a

15  search warrant served on S.G.'s computers and investigation into S.G.'s dark web

16  identities, it was determined that S.G. had operated on numerous dark web marketplaces,

17  including AlphaBay. The investigation revealed that S.G. had completed thousands of

18  transactions on the dark web where S.G. had bought and sold controlled substances

19  throughout the United States. The investigation also revealed that S.G. imported

20  narcotics into the United States.

21        23.     A sales ledger was found on S.G.'s computer with entries listing the type

22  and amount of drug sold, the buyer's dark web marketplace moniker, and the name and

23  address of where the package was sent. Two of the entries included WITTERS's name:

24            DEC 21
             Matt Witters – 1 K – sayNotoCustoms – Ab
25           7905 Detroit Ave. SW
26           Seattle, WA 98106-1906

27

28

Affidavit of Inspector Fischlin - 12
USAO#2017RO1197

JUN 17
Matt Witters – 2 K – sayNotoCustoms
2104 SW 110th St.
Seattle, WA 98146

24.     Using a law enforcement database, I found that WITTERS was associated with both of these street addresses.  S.G. told law enforcement agents that "K" on the ledger referred to Ketamine.  Ketamine is a Schedule III controlled substance.

## C.     sayNOtoCUSTOMS's Dream Market Profile

25.     As discussed above, the phrase "saynotocustoms" was found on the spiral notebook in S.G.'s residence.  On or about August 22, 2017, USPIS Inspector Brett Willyerd and I located the vendor profile for "sayNOtoCUSTOMS" on Dream Market, a dark web marketplace.[9]  The profile picture for sayNOtoCUSTOMS was of Homer Simpson wearing a reggae hat and glasses.  At that time, sayNOtoCUSTOMS was in "vacation mode," meaning that sayNOtoCUSTOMS was not actively taking new orders for narcotics via Dream Market.  However, Dream Market showed that sayNOtoCUSTOMS's last active date was on or about August 22, 2017, meaning that someone had logged into the account on that day.

26.     On or about October 6, 2017, I viewed sayNOtoCUSTOMS's profile on Dream Market.  sayNOtoCUSTOMS was no longer in vacation mode.  The following comment was under the terms and conditions of sayNOtoCUSTOMS's profile:

> BACK from vacation.  If my listings are up I am working and you will get it in timely manner, you never have to ask.  I ALWAYS take my listings down when I'm not gonna be working.  If you've ordered and haven't received it and I take my listings down and put my status on vacation rest assured your stuff is coming.

---

[9] The moniker "sayNOtoCUSTOMS" appeared on multiple dark web sites and in various other places, often with different letters capitalized.  For ease of reference, this Affidavit uses a single form of capitalization of the moniker.

Affidavit of Inspector Fischlin - 13
USAO#2017RO1197

1      27.    I observed that sayNOtoCUSTOMS had three separate listings for fentanyl,

2  varying from 500 milligrams to 3 grams.  sayNOtoCUSTOMS indicated that orders of

3  500 milligrams and under would be shipped via first-class mail.  I reviewed a listing for 1

4  gram of fentanyl and observed that the only shipping option was priority mail.  I also

5  observed a comment under the terms and conditions of sayNOtoCUSTOMS's profile

6  regarding the need for customers to use Kleopatra.  Kleopatra is an application used to

7  store PGP certificates and keys.

8      28.   On or about November 8, 2017, I viewed sayNOtoCUSTOMS's profile on

9  Dream Market.  I observed four separate listings for fentanyl, varying from 250

10  milligrams to 3 grams.  Under the terms and conditions section of the profile, I observed

11  the following: "UPDATE 11/2: I'm not retiring afterall... I had a massive loss of money

12  so I need to work still... despite the major risks.  I'm trying to find a partner to ship for

13  me but rn im doing it."  I also noticed another update: "UPDATE 10/27: I had some life

14  situation pop up this week that required my full attention ad a few packs went out late.

15  You guys know for 3 yrs I've been the fastest guy anywhere, but life happens, There

16  might be a 3-4 day delay for a few of your orders this week. sorry guys, remember I'm

17  not amazon."

18      29.   On or about November 15, 2017, I viewed sayNOtoCUSTOMS's profile on

19  Dream Market.  I observed nine separate listings for fentanyl, six of which were for nasal

20  sprays.  A 500 milligram fentanyl listing by sayNOtoCUSTOMS contained the following

21  under the shipping and refunds section of the product description:

22
23
24
25
26
27

> So due to security and shipping concerns (the bulk of orders
> are under 500mg, and having giant bags of parcels is a red
> flag), everything up to 500mg will be shipping using first
> class mail now, 1g and up will go priority with tracking, first
> class mail letters will be UNTRACKED and you agree that if
> your order is lost there will be NO RESHIPS on any orders
> up to 500mg, this is just the chance you gotta take if you
> wanna order from me.  I haven't had a parcel be lost in a long
> time, as long as the address you give me is correct and valid.

28

Affidavit of Inspector Fischlin - 14
USAO#2017RO1197

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1             If your order is 500mg and below make sure you are able to
2             get your mail daily and check for your letter.

3       30.    In addition, under sayNOtoCUSTOMS's listings for fentanyl spray there

4 was a product description, which included: "I sold thousands of these on Alpahbay. You

5 can carry them around anywhere you go and take your meds when and where you need

6 them, anyone looking thinks you just have allergies! I've literally done sprays RIGHT

7 next to a cop in line at the grocery store. Who would know? no one."

8       31.   · In addition to the fentanyl listings, there was a listing titled "REAL

9 ALPLAX 2MG BARS BY GADOR PHARMA!" The listing included a photograph of

10 numerous white strips of tablets laid on a black surface. Alplax is also know by the brand

11 name Xanax, and contains the drug alprazolam, which is a Schedule IV controlled

12 substance.

13       32.    On or about November 17, 2017, I accessed Dream Market. I was unable

14 to find any listings by sayNOtoCUSTOMS.

15       33.    On or about February 2, 2018, I logged into Dream Market and viewed

16 sayNOtoCUSTOMS's profile. Dream Market showed that sayNOtoCUSTOMS had

17 retired on November 26, 2017. Under the terms and conditions section of the profile, I

18 observed the following: "11/17; On vacation sorry guys don't know for how long, could

19 be a long time. all orders went out that were accepted, one i accepted and then rejected.

20 Sorry guys, it is what it is."

21       34.    Dream Market showed that sayNOtoCUSTOMS joined on November 13,

22 2015. sayNOtoCUSTOMS had 340 reviews with an overall rating of 4.92 out of 5. Due

23 to my experience, I know that a review is generally associated with an order, meaning

24 that sayNOtoCUSTOMS had conducted at least 340 orders on Dream Market. During

25 my reviews of the account, I observed that sayNOtoCUSTOMS had sold both fentanyl

26 and Xanax. Fentanyl was sold in the form of both a powder and a nasal spray.

27

28

Affidavit of Inspector Fischlin - 15
USAO#2017RO1197

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

**D.     sayNOtoCUSTOMS's Profile on AlphaBay**

35.     sayNOtoCUSTOMS also operated on AlphaBay, which, as described above, was a dark web marketplace that was seized by law enforcement in July 2017.  I reviewed records from the seized AlphaBay server, which contained information about the vendor account for sayNOtoCUSTOMS.  The profile picture for the account was of Homer Simpson wearing a reggae hat and glasses, which matched the profile picture for sayNOtoCUSTOMS on Dream Market.

36.     The sayNOtoCUSTOMS profile included an "about" section which began: "I'm a real fentanyl HCL vendor (pure 98% fully water soluble salts), not the bullshit analogs."  Records showed that sayNOtoCUSTOMS sold fentanyl and Xanax on the marketplace.  Fentanyl was sold in the form of both a powder and a nasal spray.

37.     A review of the AlphaBay records revealed a listing by sayNOtoCUSTOMS titled "800 REAL ALPLAX BRAND BARS BY GADOR PHARMACEUTICAL – USA."  The listing included a photograph of numerous white strips of tablets laid on a black surface.  The photograph matched the photograph for a similar listing by sayNOtoCUSTOMS on Dream Market, providing further evidence that sayNOtoCUSTOMS was controlled by the same user on both Dream Market and AlphaBay.

38.     Records showed that sayNOtoCUSTOMS registered on AlphaBay on or about November 8, 2015.  sayNOtoCUSTOMS was last active on the site on or about July 5, 2017.  sayNOtoCUSTOMS completed approximately 2,383 orders.  Records indicated that, from around November 2015 to July 2017, sayNOtoCUSTOMS received approximately 1,165 bitcoins as payment for the orders.

39.     Records further showed that sayNOtoCUSTOMS posted a message on AlphaBay Market Forum regarding the use of a mixer to anonymize coins withdrawn from AlphaBay.  The message included the following:

Affidavit of Inspector Fischlin - 16
USAO#2017RO1197

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Thats great, so I have been using bitblender[10] for my
2  blending. has anyone checked how effective AB's tumbling
   is? I'm not hip enough to figure out if w/d's strait from AB
3  are fully untraceable or is it possible to see the coins came
   from AB unless you tumble them a second time? i think .5%
4  is more than fair for simple computer operation. So I'm a
5  level 6 vendor with 3k a day in sales. should I tumble them
   still or should I be safe with AB's new tech?
6

7  **E.     Related Vendor Account on AlphaBay**

8       40.     As discussed below, the vendor account "kakashisan" on AlphaBay

9  appeared to be controlled by the same user as sayNOtoCUSTOMS.

10       41.    I reviewed the seized AlphaBay server for records pertaining to kakashisan.

11  The records showed that kakashisan registered on AlphaBay on or about September 20,

12  2015.  kakashisan was last active on the site on or about July 1, 2017.  kakashisan

13  completed approximately 215 orders for approximately 106 bitcoins.  kakashisan sold

14  fentanyl and Xanax on the marketplace.  Fentanyl was sold in the form of both a powder

15  and a nasal spray.

16       42.    Records showed kakashisan posted a message on the AlphaBay Market

17  Forum claiming to reside in Seattle.  On November 1, 2015, kakashisan also posted a

18  message advising that he had created a new account under the name sayNOtoCUSTOMS

19  which read:

20       I finally got my hands on a few hundred real Alplax bbrand
         bars by Gador pharmaceuticals (I always put alprax cause i
21       buy those too sometimes from an indian seller and i get the
         names mixed up lol, these are alplax bars by gador), they are
22       hands down the best quality xanax bar on the planet. Don't
         believe me? google it. I'm 100% sure I'm the only human on
23       early selling these us to us on any market.
24       enjoy :) i only got 400 of them but they are worth every
         penny, the champagne of bars lol.
25

26

27  _____

[10] Based upon my training and experience, I know that Bitcoin Blender is a Tor hidden service that allows
28  users to obfuscate their Bitcoin transactions.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1            I've made a new account and will be listing them on Sunday
2            11/7 under the account sayNOtoCUSTOMS

3     43.     A message from the AlphaBay server that was sent by sayNOtoCUSTOMS

4 on November 18, 2015, further indicated that sayNOtoCUSTOMS and kakashisan were

5 controlled by the same person. The message was titled, "Whoops! This is kakashisan!"

6 and included the following: "I forgot to tell you that I made this account for my vending

7 now I started vending on kakashisan and decided it was smarter to have a separate vend

8 account."

9     44.     In another message that was part of the same exchange,

10 sayNOtoCUSTOMS wrote:

11            please I've given plenty of proof this is my account, look at
           my post in november that says "This is kakashisan!" cause
12            people were getting confused, please guys i've been of or
13            your top vendors for a long time almost 600k in sales please
           you KNOW it's me. Its my commission account. I'm a good
14            vendor people really like me can you please just do this one
15            favor for me?

16 **F.    WITTERS's Ties to sayNOtoCUSTOMS and kakashisan**

17     45.     During my investigation, I uncovered numerous pieces of evidence tying

18 WITTERS to the sayNOtoCUSTOMS and kakashisan accounts. First, according to the

19 seized AlphaBay records, the date of birth associated with the sayNOtoCUSTOMS and

20 kakashisan profiles matched WITTERS's date of birth.

21     46.     Second, as detailed above, S.G.'s drug ledger indicated that

22 sayNOtoCUSTOMS was WITTERS.

23     47.     Third, USPS business records showed several USPS accounts in

24 WITTERS's name. One of the accounts listed an address of 7905 Detroit Ave SW,

25 Seattle, WA. The account had a user name of "kakashisan." It should be noted the

26 address for this account matched one of the addresses for WITTERS listed on S.G.'s drug

27 ledger.

28

Affidavit of Inspector Fischlin - 18
USAO#2017RO1197

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

48.     Fourth, the email address associated with sayNOtoCUSTOMS on Dream Market was anon432112344321@gmail.com.  I obtained a search warrant for this account and it contained several emails indicating that WITTERS had control over the email account.  For example, I located an email sent on February 18, 2016, regarding an order for Alprax in which MoneyGram was used for payment that included the following message:

> Hey bud I just sent moneygram for $660 for 100 viagra and
> 1000 alprax. $150 for the viagra and $500 for the alprax and
> $10 shipping.
> Sent to: USARAK PUTTAWONG
> Senders name: MATTHEW WITTERS
> Senders City: Seattle, WASHINGTON, USA

49.     I located another email sent by anon432112344321@gmail.com on April 15, 2016, in which the user provided a name and address for shipment.  The name and address provided was Matt WITTERS, 7905 Detroit Ave SW, Seattle, WA 98106.

50.     Fifth, I also located in this email account a message in which the user shared the PGP public key for kakashisan and otherwise referred to that vendor name and sayNOtoCUSTOMS.  Specifically, the message, send on November 9, 2015, stated:

> here is kakashisan's pgp again.  I have a new vendor account
> on alphabay called "sayNOtoCUSTOMS" I'll give you that
> pgp too.  please import both pgp certificates to your pgp.
> Kakshisan PGP, this is for SURE the same pgp as i used on
> abraxas [*i.e.*, a different dark net drug market].

51.     In addition, I located in the email account a message containing the PGP public key for sayNOtoCUSTOMS.  The message stated: "new PGP for my vendor account called sayNOtoCUSTOMS."  I also located in the email account a message addressed to the user of the account that began, "Hi saynotocustoms".

52.     Sixth, I obtained an email search warrant for a different email account associated with WITTERS, cssrules@gmail.com, which contained additional evidence.  For example, I recovered an email with an attached photograph of WITTERS holding his

Affidavit of Inspector Fischlin - 19
USAO#2017RO1197

1  driver's license and a piece of paper that said, "cryptsy – 11/24/2015" under which
2  "kakashisan" was written. I also located an email with an attached photograph of
3  numerous white strips of tablets laid on a black surface. The photograph matched the
4  photograph for the sayNOtoCUSTOMS Alplax listings on both AlphaBay and Dream
5  Market. I also located an email sent by cssrules@gmail.com attached to which were the
6  PGP private and public keys for kakashisan. The public PGP key matched the public
7  PGP key found on the seized AlphaBay server for the vendor kakashisan. I also located
8  numerous emails pertaining to orders for equipment and supplies that could be used in the
9  distribution of controlled substances via the U.S. mail. The orders included such items as
10  digital scales, heat/vacuum sealers, Mylar bags, plastic baggies, nasal spray bottles,
11  bottles with droppers, printer ink cartridges, and mailing/shipping labels. In addition,
12  numerous emails were located pertaining to USPS orders shipped to WITTERS for large
13  quantities of priority mail boxes, priority mail envelopes, address labels, tracking labels,
14  and stamps.

15      53.    Seventh, WITTERS is closely associated with Bitcoin, a cryptocurrency
16  used to conduct drug sales on Dream Market and AlphaBay. For example, WITTERS's
17  Facebook account included a post responding to a post that showed a picture of cash.
18  WITTERS posted:

19          That looks like 25k. I win lol, nah, cash is for suckers, buy
20          bitcoin man. Cash aint gonna be worth the paper it's printed
            on soon. I wish I could buy a house with bitcoin but one day
21          you will be able to. crypto is gonna get us out from under the
            banksters thumbs and we will truly be free. The age of
22          information will bring about the age of empire.
23

24      54.    Eighth, WITTERS on his Facebook page described losing a large amount
25  of bitcoins, coinciding with the time that sayNOtoCUSTOMS went dark on Dream
26  Market, explaining why he was no longer active on the dark web site. Specifically,
27  WITTERS posted on Facebook on November 17, 2017:

28

if you guys would have bought bitcoin in september when it crashed to 3kk cause china banned it (for the third time, they will be unbanning it again here soon).  btc hit 8k 3 times in the last few days.  I told you guys at $400, $650, $800, etc, I have the FB posts right here lol, you guys cant say you didn't know.  had a super bad week i got phished like an udiot and lost 600k bitcoin, almost offed myself, then I remembered I had 114 coins in an old blockchain wallet i forgot the pw to in may 2016, i pestered blockchain.com, a company that offers wallets, they had told me that if I lost my recovery phrase and had second pw I was SOL, but i was looking around about it online and fiund a post a guy nade of an email from blockchain with an attachment of all his wallet backups, I was like wtf, why shouldn't I be able to get my old wallet backup emaild to me.  They did it after pestering them for 2 days lol, It was hard too I hade to figure out how top get my private keys from the wallet it was nuts for days I sat here in the hopes this would work and last night I did it I got 114 bitcoins woth about 850k lol, sucks I got hacked but i prolyl never would have gotten that wallet back if I wasn't desperate lol.

55.     As noted above, sayNOtoCUSTOMS left Dream Market on or about November 26, 2017, posting on November 17, 2017, the day of the Facebook post above: "11/17; On vacation sorry guys don't know for how long, could be a long time. all orders went out that were accepted, one i accepted and then rejected. Sorry guys, it is what it is."

G.     **WITTERS's Accounts**

      **I.     Witters's U.S. Bank Accounts**

56.     According to records obtained from U.S. Bank, WITTERS opened a checking account (-1982) (i.e., WITTERS's Checking Account) in December 2015 and a savings account (-7643) (i.e., WITTERS's Savings Account) in March 2018.

      **1.     WITTERS's Checking Account**

57.     WITTERS's Checking Account is largely funded by electronic deposits from the digital currency exchanges Coinbase and Gemini, as well as cash deposits. Specifically, from December 2015 to October 2018, a total of approximately $871,438.67 was deposited into WITTERS's Checking Account—of which, approximately

Affidavit of Inspector Fischlin - 21
USAO#2017RO1197

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  $810,742.31 was received from Coinbase and Gemini, while $14,780 was deposited in

2  the form of cash (as detailed below). It should be noted that WITTERS's Checking

3  Account was opened shortly after "kakashisan" and "sayNOtoCUSTOMS" began selling

4  controlled substances on AlphaBay.

5       58.    The deposits from Coinbase and Gemini into WITTERS's Checking

6  Account include the following:

| Date[11] | Depositing Institution | Amount |
|---|---|---|
| 12/22/15 | Coinbase | $2,000 |
| 1/26/16 | Coinbase | $3,000 |
| 3/7/16 | Coinbase | $2,000 |
| 3/29/16 | Coinbase | $891.35 |
| 6/24/16 | Coinbase | $2,290 |
| 11/30/17 | Gemini | $9,000 |
| 12/19/17 | Gemini | $100,000 |
| 12/21/17 | Gemini | $100,000 |
| 12/22/17 | Gemini | $100,000 |
| 12/27/17 | Gemini | $100,000 |
| 12/28/17 | Gemini | $100,000 |
| 1/9/18 | Gemini | $100,000 |
| 1/16/18 | Gemini | $100,000 |
| 1/17/18 | Gemini | $91,560.96 |
| | **Total =** | $810,742.31 |

---

[11] The dates listed are those included on WITTERS' U.S. Bank statements. The actual deposit date may predate the date listed.

Affidavit of Inspector Fischlin - 22
USAO#2017RO1197

1       59.    Records from Coinbase revealed an account in WITTERS's name that had

2  transacted in approximately 301 bitcoins.  Records revealed at least two bitcoin wallet

3  addresses provided by sayNOtoCUSTOMS on AlphaBay for withdrawal purposes

4  resolved to the Coinbase account in WITTERS's name.  Furthermore, records from

5  Coinbase contained a note that WITTERS's account was associated with a high volume

6  of dark web market activity and specifically listed AlphaBay.  Based on my training and

7  experience, I submit that this information demonstrates that WITTERS's Coinbase

8  account was directly linked to dark web narcotics proceeds.

9       60.    WITTERS's Checking Account is also funded by cash deposits.  These

10  cash deposits, which cumulatively amount to more than approximately $14,780, include

11  the following:

| Date | Amount |
|------|--------|
| 12/18/15 | $200 |
| 4/5/16 | $2,000 |
| 4/12/16 | $1,620 |
| 1/2/17 | $420 |
| 1/3/17 | $2,000 |
| 1/20/17 | $6,000 |
| 3/20/17 | $1,340 |
| 6/17/17 | $200 |
| 6/23/17 | $1,000 |
| **Total =** | $14,780 |

       61.    As of October 9, 2018, WITTERS's Checking Account held a balance of

approximately $132,583.18.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1             2.     WITTERS's Savings Account

2        62.     WITTERS's Savings Account was solely funded by a $500,000 electronic

3 transfer from WITTERS's checking account on or about March 15, 2018.

4        63.     As of October 24, 2018, WITTERS's Savings Account held a balance of

5 approximately $329,250.15. As described further below, the remaining approximately

6 $170,000 (of the $500,000 transfer noted in the paragraph above) was transferred to

7 another account held in WITTERS's name.

8     **H.**     **WITTERS's GBC Account**

9        64.     According to records obtained from GBC International Bank, WITTERS

10 opened a savings account (-1014) (i.e., WITTERS's GBC Savings Account) in May

11 2017. WITTERS's GBC Savings Account was funded entirely by cash deposits. These

12 cash deposits include the following:

13

| Date | Amount |
|------|--------|
| 5/17/17 | $900 |
| 7/21/17 | $1,000 |
| 8/31/17 | $680 |
| 9/21/17 | $600 |
| **Total =** | **$3,180** |

20        65.     As of December 3, 2018, WITTERS's GBC Savings Account held a

21 balance of approximately $3,860.69.

22        66.     WITTERS also holds the SAFE DEPOSIT BOX at GBC International

23 Bank. On or about November 7, 2017, an HSI SA interviewed employees at the bank in

24 Shoreline, WA. Several employees stated that WITTERS was observed bringing in

25 bundles of U.S. currency to put into the SAFE DEPOSIT BOX. WITTERS told

26 employees he made the money from bitcoin.

27        67.     On or about November 13, 2018, an HSI SA interviewed employees at the

28 bank again. An employee confirmed that WITTERS is still the lessee of the SAFE

Affidavit of Inspector Fischlin - 24
USAO#2017RO1197

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  DEPOSIT BOX. An employee witnessed WITTERS access the SAFE DEPOSIT BOX

2  with bundles of currency in a bag and then come out without the bag. An employee

3  indicated that WITTERS openly spoke about how much money he made with bitcoin.

4  An employee advised that the SAFE DEPOSIT BOX was last accessed in March 2018.

5      68.   I know based on my training and experience working narcotics cases that

6  drug dealers often use safe deposit boxes to hide valuables and the proceeds of their illicit

7  activities. The placement of these items in these locations serves to protect these items

8  from theft, as well as from potential seizure should law enforcement execute a search

9  warrant at the drug trafficker's primary residence.

10      69.   I also know that persons involved in the trafficking of illicit drugs often keep

11  large amounts of cash either on hand, on their person, within their residence or within safe

12  deposit boxes. I also know that drug dealers often convert cash proceeds into valuable items

13  such as precious metals and gems such as gold, silver, jewelry, *etc.* I also know from

14  training and experience that drug dealers often keep records of drug sales and transactions.

15  These records are kept so that the drug dealers can keep track of the money owed to them

16  for the amount of drugs being sold.

17  **III.   WITTERS's Gemini Account**

18      70.   According to its website, www.gemini.com, Gemini Trust Company is a

19  digital asset exchange that allows users to buy, sell, and store digital assets such as

20  bitcoins.

21      71.   According to records obtained from Gemini, WITTERS opened an account

22  (i.e., WITTERS's Gemini Account) in August 2017. WITTERS's Gemini Account is

23  linked to WITTERS's Checking Account.

24      72.   From approximately October 2017 through October 2018, more than

25  approximately 600 BTC were deposited into WITTERS's Gemini Account. These

26  deposits included an initial set of deposits made from October 3, 2017, through October

27  8, 2017, cumulatively amounting to approximately 121.22269495 BTC (worth

28  approximately $530,808.52 U.S. dollars as of early October 2017). Records indicate that

Affidavit of Inspector Fischlin - 25
USAO#2017RO1197

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   hundreds of purchases and sales of cryptocurrencies (primarily bitcoins) were made via

2   the account, and that the account's U.S. dollar balance varied from as little as $0.01 to

3   $1,501,937.26.  As detailed in a table above, between November 30, 2017, and January

4   17, 2018, a total of approximately $800,560.96 was withdrawn from WITTERS's Gemini

5   Account and transferred to WITTERS's Checking Account.

6       73.    As of October 24, 2018, WITTERS's Gemini Account held balances of

7   approximately $155,928.01 U.S. dollars and 0.29215414 BTC.

8       74.    During my review of WITTERS's Gemini Account, I located several

9   messages exchanged between WITTERS and Gemini.  The messages pertained to the

10   source of WITTERS's bitcoins.  For example, I observed the following message sent by

11   WITTERS on January 12, 2018:

12         "The coins i purchased at a minute fraction of what they are now and over

13         the yrs have been converted so many times and sent to exchanges and back

14         and cross chains there is absolutely no possible way to show it. If i had

15         deposited 200 bitcoins 2 years ago you wouldn't have even noticed right? I

16         can't image that I'm alone in suddenly having a large account balance."

17

18         "I have found proof that I was buying bitcoins on coinbase in 2015, Would

19         a download of my transactions showing deposits into coinbase in 2015

20         suffice to show I have been active in buying and trading bitcoins? I can

21         upload the excel file if you would like. This shows that I was making

22         deposits into coinbase in December 2015."

23       75.    Based on my training and experience, I submit that this information

24   demonstrates that WITTERS's Gemini account and the bitcoins deposited into that

25   account (as well as derivative U.S. dollars and cryptocurrencies held in the account) were

26   the proceeds of, and/or derived from, dark web narcotics sales.

27       76.    Based on my training and experience, and as further detailed above, I

28   believe that Gemini, if served with a warrant to seize cryptocurrencies held in a Gemini

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  user's wallet, is capable of assisting law enforcement with the execution of that warrant

2  by, among other things, facilitating the transfer of said cryptocurrencies into a law

3  enforcement-controlled wallet.  I therefore request that the Court authorize law

4  enforcement to execute the requested warrants pertaining to WITTERS's Gemini wallets

5  by serving the warrant directly upon Gemini itself.

6  **IV.     WITTERS's Robinhood Account**

7        77.    Robinhood Markets, Inc. ("Robinhood") is a financial services company

8  that allows users to invest in publicly traded companies, exchange-traded funds, and

9  cryptocurrencies.

10       78.    According to records obtained from Robinhood, from June 2018 through at

11  least October 2018, a cumulative total of approximately $170,000 in funds were

12  transferred from WITTERS's Savings Account to a Robinhood account (i.e.,

13  WITTERS's Robinhood Account).  For example, the following funds were transferred

14  from WITTERS's Savings Account to WITTERS's Robinhood Account on or about the

15  dates listed below:

| Date | Amount |
|------|--------|
| 6/13/18 | $20,000 |
| 8/22/18 | $50,000 |
| 9/5/18 | $50,000 |
| 9/24/18 | $50,000 |
| **Total =** | $170,000 |

23       79.    As of October 31, 2018, WITTERS's Robinhood Account had a U.S. dollar

24  balance of approximately $167,293.25.

25  **V.      WITTERS's Bittrex Account**

26       80.    According to its website, www.bittrex.com, Bittrex is a blockchain

27  platform that provides users with digital wallets and the ability to execute trades.

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      81.      According to records obtained from Bittrex, WITTERS opened an account

2  (i.e., WITTERS's Bittrex Account) in July 2016.  WITTERS's Bittrex Account is largely

3  funded by deposits of bitcoins.  Account records indicate that, from around August 2017

4  to October 2018, approximately 155 sell orders were executed in which bitcoins were

5  exchanged for units of Tether (another form of cryptocurrency).  As of November 8,

6  2018, WITTERS's Bittrex Account had a balance of 25,936 units of Tether (which are

7  worth approximately $25,798.74 U.S. dollars at prevailing market rates).

8      82.      Based on my training and experience, and on information described herein,

9  I submit that the bitcoins deposited into WITTERS's Bittrex Account—as well as any

10  derivative assets (including bitcoins or other cryptocurrencies)—are the proceeds of,

11  and/or derived from, dark web narcotics sales.

12      83.      Based on my training and experience, and as further detailed above, I

13  believe that Bittrex, if served with a warrant to seize cryptocurrencies held in a Bittrex

14  user's wallet, is capable of assisting law enforcement with the execution of that warrant

15  by, among other things, facilitating the transfer of said cryptocurrencies into a law

16  enforcement-controlled wallet.  I therefore request that the Court authorize law

17  enforcement to execute the requested warrants pertaining to WITTERS's Bittrex wallets

18  by serving the warrant directly upon Bittrex itself.

19  **H.      WITTERS's Criminal History and Income**

20      84.      WITTERS's criminal history includes a felony conviction for Possession of

21  a Controlled Substance.

22      85.      After reviewing the transactional histories of WITTERS's Checking,

23  WITTERS's Savings Account, and WITTERS's GBC Savings Account, I was unable to

24  identify any recurring deposits that would suggest that WITTERS was earning a salary,

25  dividends, or other form of recurring legitimate income during the time period of

26  December 2015-October 2018.  The only exception appeared to be deposits from the U.S.

27  Government pertaining to Supplemental Security Income ("SSI") benefits into

28

Affidavit of Inspector Fischlin - 28
USAO#2017RO1197

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  WITTERS's Checking Account, which from January 2018 to October 2018 cumulatively

2  amounted to approximately $29,380.

3      86.      I have obtained records from the Washington State Employment Security

4  Department, after requesting information related to WITTERS.  According to records

5  provided by the Employment Security Department, WITTERS reported a total of

6  approximately $5,486 in income during the time period of 2012 through June 2018.

7

8                        **CONCLUSION**

9      87.      Based upon the evidence gathered in this investigation and set out above, I

10  submit that there is probable cause to believe that the SUBJECT ASSETS constitute

11  property constituting, or derived from, proceeds obtained, directly or indirectly, as the

12  result of violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 and therefore that the

13  SUBJECT ASSETS are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(b),

14  and 21 U.S.C. §§ 853(a), 853(f), and 881(a)(6).

15

16  _____

17      MICHAEL FISCHLIN
       Inspector, USPIS

18

19

20  SUBSCRIBED AND SWORN before me on this ___ day of December, 2018.

21

22  _____

23      PAULA L. McCANDLIS
       United States Magistrate Judge

24

25

26

27

28

Affidavit of Inspector Fischlin - 29
USAO#2017RO1197

## **ATTACHMENT A-1**
Place To Be Searched

The place to be searched is 5834 NE 75th Street, apt B208, Seattle, WA 98115.

## **ATTACHMENT A-2**
Place To Be Searched

The property to be searched is an Android phone, model 1+, phone number 206-316-6268, believed to belong to MATTHEW WITTERS.

## **Attachment B-1**

 This warrant authorizes the government to search for the following items that are evidence and/or fruits of possession of controlled substances with intent to distribute and/or distribution of controlled substances:

1. Any controlled substances, in particular fentanyl

2. Drug Paraphernalia: Items to be used to store and distribute controlled substances, such as plastic bags, cutting agents, scales, measuring and packaging equipment and similar items.

3. Drug Transaction Records:  Documents such a ledgers, receipts, notes, books and similar items relating to the acquisition, and distribution of controlled substances, however stored, including in digital devices.

4. Customer Supplier Information:  Items identifying drug customers and drug suppliers, such as address and/or telephone books, correspondence, diaries, calendars, notes with phone numbers and names, "pay/owe sheets" with drug amounts and prices, papers reflecting names, addresses, and/or telephone numbers of co-conspirators.

5. Documents reflecting  the source, receipt, transfer, ownership and disposition of the United States Currency or other monetary  instruments, of real estate and personal property, such as vehicle registration, insurance documents, account bank statements, registers, deposit tickets, concealed checks, loan paperwork, wire transfer receipts, debit and credit tickets, and correspondence.

6. All bank and financial records, including bank statements, wire transfers slips/orders, money order receipts, ATM receipts, cashier checks, cashier check receipts, and safe deposit records for the years 2014 through the present.

7. Rental Agreements, correspondence, keys and entry records for the safe deposit boxes and storage units.

8. Correspondence, papers, records, and any other items showing employment or lack thereof.

9. Records of domestic of domestic and foreign travel such as itineraries, passports, tickets, lodging receipts, and payment records.

10. Records an item identifying smart phones, telephones and pagers used by conspirators including telephone toll bills, pager bills, subscriber agreements, cellular telephones/smart phones and pagers.

11. All firearms and ammunition.

12. Items tending to establish the identity of persons in control of the premises or vehicle being searched.

13. For the Tower, ASUS model, v12xT,

    a. evidence of who used, owned, or controlled the digital device or other electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b. evidence of software that would allow others to control the digital device or other electronic storage media, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

    d. evidence of the attachment to the digital device of other storage devices or similar containers for electronic evidence;

    e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

    f. evidence of the times the digital device or other electronic storage media was used;

    g. passwords, encryption keys, and other access devices that may be necessary to access the digital device or other electronic storage media;

    h. documentation and manuals that may be necessary to access the digital device or other electronic storage media or to conduct a forensic examination of the digital device or other electronic storage media;

i. contextual information necessary to understand the evidence described in this attachment.

j. all documents reflecting cryptocurrencies, including web history, and documents showing the location, source, and timing of acquisition, of any cryptocurrencies

THE SEIZURE OF THE COMPUTER DESCRIBED ABOVE IS AUTHORIZED FOR THE PURPOSE OF THE CONDUCTING OFF-SITE EXAMINATION OF ITS CONTENTS FOR EVIDENCE, INSTRUMENTALITIES, OR FRUITS OF THE AFOREMENTIONED CRIMES

**ATTACHMENT B-2**
Items to be Seized

This warrant authorizes the government to search for the following items that are evidence and/or fruits of possession of controlled substances with intent to distribute and/or distribution of controlled substances:

      a.     Assigned number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);

      b.     Stored list of recent received, sent, and missed calls;

      c.     Stored contact information;

      d.     Stored photographs of narcotics, currency, firearms or other weapons, evidence of suspected criminal activity, and/or the user of the phone or suspected co-conspirators, including any embedded GPS data associated with those photographs;

      e.     Stored text messages.

      f.     digital currency applications and wallets, to include information regarding current balance and transaction history, *i.e.*, date, time, amount, and address of the sender/recipient of a digital currency transaction maintained in such wallets;